Glen H. Mertens (SBN: 101091)
Carlos A. De La Paz (SBN: 290166)
ROSTAM LAW, INC.
2204 Garnet Ave., Suite 303
San Diego, CA  92109
Telephone:  (213) 612-7776
Facsimile (858) 605-0753
Email: cdelapaz@rostamlaw.com

Attorney for Plaintiff Hip Hop Beverage Corporation

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HIP HOP BEVERAGE CORPORATION, a Nevada corporation <br><br> Plaintiff, <br><br> v. <br><br> MONSTER ENERGY COMPANY, a Delaware corporation, and DOES 1 through 10; <br><br> Defendant. | Case No.: 2:16-cv-1421 <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:** <br><br> **(1) Violation of Sherman Act 15 U.S.C. § 1;** <br> **(2) Violation of Sherman Act, 15 U.S.C. § 2;** <br> **(3) Violation of Clayton Act, 15 U.S.C. § 14;** <br> **(4) Violation of Business & Professions Code § 16720;** <br> **(5) Violation of California Business & Professions Code § 17200;** <br> **(6) Intentional Interference With Contractual Relations; and** <br> **(7) Intentional Interference with Prospective Economic Advantage** <br><br> **[DEMAND FOR JURY TRIAL]** |

1

Plaintiff, Hip Hop Beverage Corporation, files this Complaint against defendant Monster Energy Company, and demanding trial by jury, complains and alleges as follows:

## I.   JURISDICTION, PARTIES AND VENUE

1.     Counts One through Three of this Complaint are filed and these proceedings are instituted against the above-named defendant under Section 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to recover the damages caused by, and to secure injunctive relief against, defendant for its violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§1, 2) and Section 3 of the Clayton Act (15 U.S.C. § 14). This Court has original jurisdiction over the federal antitrust claims pursuant to 28 U.S.C. § 1337 and 28 U.S.C. §1331.

2.     Defendant transacts business, maintains an office, and may be found within the Central District of California. The interstate trade and commerce involved and affected by the alleged violations of the antitrust laws were carried on in part within the District.   Defendant sells its products across state lines. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 15 and 22.

## *FACTS COMMON TO ALL COUNTS*

## II.   THE PARTIES

3.     Plaintiff Hip Hop Beverage Corporation ("Hip Hop") is a Nevada corporation, with its principal place of business located in Los Angeles, California at 20600 Belshaw Ave., Carson, California, 90746. Plaintiff is engaged in the production, sale and distribution of energy drinks, marketed as Pit Bull Energy Products ("Pit Bull Products".)

4.     Defendant Monster Energy Company ("Monster") is a corporation organized and existing under the laws of the state of Delaware, with its principal place

of business located in Corona, California. Monster is a major competitor in the energy drink product market, possessing or controlling a major percent of such market.

5.    Plaintiff and Defendant Monster are direct competitors in the energy drink market as manufacturers of energy drinks.

### III.    NATURE OF TRADE AND COMMERCE

6.    Plaintiff Hip Hop is a manufacturer of retail products. The relevant products in this case are energy drinks, consisting of various flavors, including sugar-free energy drinks.

7.    The relevant energy drink market in this case are retail stores and the military resale market, both in the United States and globally.

8.    The process for energy drink manufacturers in selling products to purchasers of retail stores is not necessarily the same, and sometimes different, than the process in selling products to the military resale market.

### A.    *Military Resale Market*

9.    The Military Resale Market consists of various grocery stores for members of the U.S. military. Specifically, the Military Resale Market consists of 503 exchanges, 247 commissaries, as well as hundreds of smaller convenience stores, package stores, troop stores and other facilities. The Military Resale Market is to be found wherever U.S. Soldiers, Sailors, Airmen, Marines or Coastguardsmen are located, including bases and large maritime ships.

10.    The Military Resale Market is operated by The U.S. Defense Commissary Agency ("DECA".)

11.    DECA was established on May 15, 1990, by a memorandum from the Deputy Secretary of Defense. DECA assumed full purchasing control of all commissaries on October 1, 1991 by centralizing the headquarters to Fort Lee,

3

Virginia. Based upon information and belief, in mid-2013, the total of U.S. Military commissary authorized patrons was in excess of 12,000,000.

12.    Military commissaries sell groceries and household goods. Commissaries are recognized as providing one of the top benefits for today's military.

13.    The commissary retail function developed and grew, in parallel to the development of the retail grocery industry. Based upon information and belief, the per store dollar volume is roughly double that of the average supermarket. In 2013, the overall annual volume of the DECA commissary system was approximately $5.8 Billion dollars worldwide.

14.    The list of eligible shoppers has also grown. Originally, only active–duty Army personnel could shop. Today, personnel in all services, including the Coast Guard, may shop in the commissary on any U.S. military installation, around the world. Retirees have shopping privileges, as do reservists and members of the National Guard. Immediate family members of service personnel are also eligible commissary shoppers.

### i.    DECA's Purchasing Process

15.    The DECA purchasing and stocking process is complex. All products sold within the military resale market must meet the requirements of U.S.C. Title 10 (Organization and General Military Powers). Manufacturers typically require the assistance of consultants and brokers to navigate this complex process.

16.    DECA headquarters are located in Fort Lee, Virginia. All product purchasing decisions for commissaries worldwide are made at DECA headquarters in Virginia.

17.    In selling a product to the commissaries, the first step a manufacturer must undertake is to make a presentation to DECA either at its headquarters (for worldwide product placement) or at its regional offices (for regional product

4

placement). DECA headquarters will then review the product, and decide whether a manufacturer's product will be offered for sale within commissaries, and also whether a product will be sold regionally or worldwide.

18.   A product code is given by DECA for each product that DECA authorizes for sale at commissaries. This product code grants products various levels of authorization for sales to commissaries.

19.   DECA assigns the following product codes for products sold in commissaries:

| Product Code | Level of DECA Authorization |
|---|---|
| K | Mandatory stockage in all DECA regions worldwide |
| M | Mandatory in more than one regional area but not all regions |
| R | Mandatory in only one regional area |
| S | Optional/available to all stores in a regional area |
| O | Available seasonally |
| P | Phases out pending delete |

20.     Upon information and belief, DECA requires manufacturers that have never conducted business with DECA to use the assistance of brokers for presentation of a product to DECA and for sales to the commissaries because the process is complex.

21.     This complex process requires the use of brokers and distributors that are constantly monitoring the supply levels of a manufacturer's products in each of the commissaries.

22.     There are generally two different types of brokers within the military resale system – the Master Level Brokers ("Master Brokers") and the Commissary Level Brokers ("Sub-level Broker".)

23.     Both the Master and Sub-level Brokers are vital for a product to reach a retail shelf for sale at a commissary, especially for a new manufacturer that has never conducted business with DECA.

24.     Master Brokers are expected to coordinate manufacturer's product presentations at DECA headquarters. Master Brokers are also expected to work with manufacturers to ensure that they are registered and able to use DECA's electronic data interchange system ("EDI".) Upon information and belief, the EDI is an online accounting system in which manufacturers can monitor the amount of inventory they have at commissaries for a particular product. Upon information and belief, the EDI is also a system in which commissaries can order additional inventory when the product becomes low. Master Brokers are responsible to ensure a manufacturers Universal Product Code ("UPC") are entered correctly into DECA's various electronic systems so a proper accounting can be generated.

25.     Master Brokers are also expected to periodically coordinate product reviews with DECA for the purpose of increasing a product's code designation with

DECA (e.g., S code, or K code, etc.). Upon information and belief, DECA considers various factors when determining a product code designation, including demand of the product, competitive cost of the product, etc.).

26. Often times, Master Brokers utilize Sub-level Brokers to conduct store-to-store sales of manufacturer's products, and to monitor a product's inventory count at each commissary.

27. Sub-level brokers are responsible for the "in-store merchandising" of products at commissaries. In-store merchandising involves various Sub-level Broker responsibilities, including physically walking through commissaries to monitor the status and inventory levels for products. Sub-level Brokers also coordinate store-level demonstrations, which is typically accomplished by retaining independent contractors. During these store-level demonstrations, the independent contractors are hired to represent the manufacturer's product in an effort to increase brand awareness of the product.

28. Sub-level brokers are expected to monitor products on the shelf, and the product's displays, to ensure the products are fully stocked, and the displays are not falling apart (as happens over time).

29. The DECA/commissary process is complex and, upon information and belief, that is why DECA typically requires manufacturers, especially smaller manufacturers, to go through Master and Sub-level Broker channels in order to sell products on commissary shelves.

IV.  **MONSTER'S CONDUCT WITHIN THE MILITARY RESALE MARKET**

30. Plaintiff is a small manufacturer in the military resale system and has been selling through the DECA system since 2007. Before Plaintiff could begin

HIP HOP BEVERAGE CORP. V. MONSTER ENERGY COMPANY COMPLAINT

selling products through the military resale system, DECA required, and Plaintiff utilized, the services of a Master and Sub-level Broker.

31.   In 2007, Plaintiff entered into a written contract with Mid Valley Products, a division of Eurpac Service, Inc., a Connecticut Corporation ("Mid Valley".) Mid Valley agreed to provide Master Broker services on Plaintiff's behalf, and contract directly (at its own expense), a Sub-level Broker(s) to represent Plaintiff at each commissary.

32.   In 2007, when Mid Valley contracted with Plaintiff, Mid Valley already had in place an existing contract with High Plains Marketing Services, Inc. a Colorado Corporation ("High Plains") to provide Sub-level Broker services at commissaries on behalf of manufacturers contracted with Mid Valley, including Plaintiff's products.

33.   Upon information and belief, in or around 2007, Monster had an existing business relationship with High Plains, such that High Plains was retained by Monster to provide Sub-level Broker related services for Monster's products at the commissaries.

34.   On January 4, 2013, Plaintiff received a letter from Mid Valley's President, Michael Stewart, terminating the contract between Plaintiff and Mid Valley "due to conflicts at the broker level with regards to competing energy drink companies."

35.   Upon believing Mid-Valley breached its contract with Plaintiff, Plaintiff filed suit against Mid-Valley for breach of contract (*Hip Hop Beverage Corporation v. Eurpac Service Incorporated,* case no. 14-CV-02049-JFW-AJW).

36.   In November 2014, during the course of discovery in the Mid-Valley Lawsuit, Plaintiff discovered that Monster forced Mid Valley to terminate their contract with Plaintiff. Monster accomplished this disruption by first engaging with High Plains, to have High Plains instruct Mid-Valley to stop servicing Plaintiff's

8

products, or else High Plains will be forced to cancel their contract with Mid-Valley. Mid-Valley, apparently seeing it as the only feasible financial outcome, terminated its contract with Plaintiff because it would have been more expensive for Mid Valley to retain a new Sub-level Broker, than to terminate their contract with Plaintiff.

37.    Monster's conduct of disruption was discovered at the deposition of Mid-Valley's president, Michael Stewart, on November 20, 2014. When asked whether Monster, through High Plains, demanded Stewart to terminate Mid-Valley's contract with Plaintiff, Stewart replied "yes".

38.    In an email dated January 11, 2013, Michael Stewart states (in relation to the January 4, 2013 Hip Hop contract termination letter), that "this finally hit Monster's radar, as these guys at Hip Hop have been really aggressive lately." Upon information and belief, Monster and High Plains engaged in this conduct when they learned that Plaintiff Hip Hop's sales were growing within the military resale system.

39.    Upon information and belief, Monster was aware that Plaintiff and other competitors, would not be allowed to sell products through the military resale system without Master or Sub-level Brokers as DECA requires.

40.    There were several problems that existed for Plaintiff's products while it was in contract with Mid Valley, including shoddy product displays, incorrect entry of Plaintiff's product UPC information in DECA's electronic accounting system, and overall neglect regarding product placement and presentation with DECA for product code advancement.

41.    It was discovered that, throughout Plaintiff's relationship with Mid-Valley, some commissaries were not receiving orders of Plaintiff's products, which was likely due to incorrect UPC information. Upon information and belief, Mid-Valley and High Plains were aware of these problems for Plaintiff's products, but did not correct the problems due to the influences exerted by Monster.

i.      *Monster Eliminates Competition by Controlling the Brokers*

42.     Monster is able to eliminate competition in the military resale market by exerting influence over the Master and Sub-level brokers so that the brokers either provide shoddy services to competitors, or no services at all.

43.     The Mid-Valley contract is not the only instance Monster exerted its influence to prevent a competitor from obtaining a Master Broker contract.

44.     In 2013, after Mid Valley terminated its contract with Plaintiff, Plaintiff Hip Hop was able to obtain a Master Broker contract with Reese Group. Reese Group agreed to represent Plaintiff's products to DECA as Plaintiff's Master Broker (to replace Mid-Valley). However, shortly after execution of the Reese Group contract, with no explanation, Reese Group terminated its Master Broker contract with Plaintiff Hip Hop.

45.     It was discovered in November 2014, through discovery of the Mid-Valley lawsuit, that Reese Group terminated their contract with Plaintiff at the demand of Monster, through again, High Plains. Upon information and belief, Monster again colluded with High Plains to force Reese Group to terminate their contract with Plaintiff (similarly as Monster did with Mid Valley).

46.     In an email dated August 12, 2013, from Michael Stewart of Mid Valley to Don Goetz, the President of High Plains, Stewart states "[t]his may be a continuation of the problem – doesn't [High Plains] represent Reese Sales?" Goetz was referring to Reese Group's termination of Plaintiff's Master Broker contract. In reply, Goetz states, "Michael, we talked to Reese and they resigned [Hip Hop]." Monster's actions with Mid Valley and Reese Group evidence a pattern of conduct intended to keep competitors out of the military resale market – by not allowing competitor's access through the normal supply channels that are required by DECA for manufacturers such as Plaintiff.

47.    It was not until the fall of 2013, after the Reese Group terminated its contract with Plaintiff, when Plaintiff was finally able to obtain another broker contract with WEBCO General Partnership, a Virginia company ("WEBCO"), to provide Master and Sub-level broker services to the military resale system. However, in November 2014, WEBCO ceased honoring its broker obligations under its contract with Plaintiff by refusing to deal with Plaintiff. After November 2014, Plaintiff has attempted to obtain a response from WEBCO regarding its refusal to do business with Plaintiff, and as of the filing of this complaint, WEBCO has not responded to Plaintiff.

48.    Upon information and belief, Plaintiff's contract with WEBCO was disrupted by Monster's influence, due to the relationship between Monster and WEBCO, which was similar to the relationship between Monster and High Plains, Mid-Valley, and Reese Group.

49.    Monster's conduct of disruption within the military market is continuing. Monster controls the military and retail markets by controlling the only available brokers necessary to reach the consumers. As a result of Monster's conduct, Plaintiff and other competitors of Monster, are unable to deliver their products to DECA customers.

50.    Upon information and belief, Defendant Monster eliminates competition in the military resale market by interfering with competitor's contractual relations with brokers in the supply chain. Essentially Defendant Monster enters into exclusive dealings arrangements with the limited number of available brokers in the U.S. military resale and civilian retail markets, and prevents them from dealing with any competitors. This conduct prevents competitors, such as the case here, from entering the energy drink products market for the U.S. military resale system and civilian retail channels.

51.   In 2014, it was discovered that Monster contracted with Mid-Valley for Master Broker related services to DECA. Upon information and belief, it is Monster's plan to control the military resale market by controlling the available brokers that are permitted to broker products for DECA.

52.   The anti-competitive effect on this exclusive dealing by Monster and the Master and Sub-level Brokers is that Plaintiff was excluded from selling energy drink products to customers from the years 2007 to at least 2015.  Plaintiff discovered orders from commissaries that went unfilled because the Master and Sub-level Brokers were influenced by Monster to neglect competitor's products.

53.   Plaintiff was eventually unable to locate an available broker in the military resale market. As a result, Plaintiff is forced to sell its products through the military resale system without the use of broker expertise, and was unable to sell any product to DECA for several months as a result of Monster's interruption. Plaintiff has and continues to experience lost profits as a result of Monster's monopolization and intentional interference with Plaintiff's contractual relationship with Mid Valley, and prospective economic relations with DECA.

54.   There are significant and high barriers to market entry which preclude entry of new competitors to dissipate Monster's monopoly of energy drinks in the military resale market, including but not limited to the following: (a) copyrights, trade dress and other intellectual property protections, (b) the difficulty to overcome an entrenched competitor Monster (Pepsi co with Rock Star Energy Drinks, and Red Bull) which has a substantial product line to leverage, and (d) the required capital to meet ordering requirements from the military.

55.   The manufacture, sale and distribution of energy drinks are in, and directly affect, interstate commerce. The antitrust violations alleged herein have had and, unless restrained by this Court, will continue to have the effect of substantially

suppressing, distorting, eliminating and interfering with competition in the above-described product market in the flow of interstate commerce.

56.    Defendant Monster's acts and practices have had and, unless enjoined, will continue to have the following injurious effects:

a) Competition among the Defendant has been suppressed and diminished;

b) Consumer freedom of choice has been suppressed and diminished;

c) Distributors, and Shippers, freedom of choice has also been depressed and diminished.

## V.    MONSTER'S CONDUCT IN OTHER MARKETS

57.    Based upon information and belief, Defendant Monster has disrupted Plaintiff's business in other retail markets, and has accomplished this result through similar conduct as in the military resale market. For example, based upon information and belief, Monster disrupted Plaintiff's contractual and prospective economic relationship with Costco Wholesale Corporation ("Costco") and Walgreen Company ("Walgreen") by preventing Plaintiff access through normal broker channels of distribution. Monster's conduct in the civilian market is continuing.

58.    Defendant Monster engages in a pattern of conduct that is meant to eliminate customer energy drink purchasing options by intimidating the brokers necessary to facilitate sales to customers. Based upon information and belief, Defendant Monster's actions are consistent between the military resale market, and the civilian retail market, including end purchasers such as Costco and Walgreen.

59.    Plaintiff has and continues to experience lost profits as a result of Monster's monopolization and intentional interference with Plaintiff's prospective economic relationship with Costco and Walgreen.

1

2

3

4

**FIRST CAUSE OF ACTION –**

**VIOLATION OF SECTION 1 OF THE**

**SHERMAN ACT, 15 U.S.C. § 1**

(Against Monster)

5   60.   The allegations set forth above at paragraphs 1 through 59 inclusive of

6   this Complaint are incorporated by reference as if fully set forth hereat.

7   61.   Beginning on or about 2007 and continuing to the present, defendant has

8   acted to unreasonably constrain trade and commerce in the energy drink product

9   market for both the U.S. military resale market, and the civilian market, by conspiring

10  with necessary market brokers to refuse to deal with competitors, including Plaintiff.

11  62.   Because there are a limited number of companies that offer brokering

12  services, especially in the case with the military resale market, Monster's conspiracy

13  with High Plains and Mid-Valley threatens the continued viability of any such energy

14  drink company. Accordingly, by conspiring with brokers to not deal with competitors,

15  Monster's conduct operates to protect itself from competition in violation of the

16  Sherman Act.

17  63.   Defendant Monster's acts and practices have had and, unless enjoined,

18  will continue to have the following injuries effects:

19          a)  Competition among Monster has been suppressed and diminished;

20             and

21          b)  Consumer freedom of choice has been suppressed and diminished;

22             and

23          c)  Consumers are forced to pay higher prices for energy drinks

24             established by defendant Monster.

25  64.   As a direct and proximate result of the conduct alleged in this Court,

26  Plaintiff has suffered and will continue to suffer substantial financial injury in its

27

28

business and property in that it is being deprived of its ability to function as a manufacturer in the energy drink military resale and civilian retail markets. As a result, plaintiff has been deprived of revenue and profits it would otherwise have made. Plaintiff has not calculated the precise extent of its past damages, but estimates its damages, which continue to accrue, are in the estimated range of at least millions of dollars. When Plaintiff has sufficient information to allege with specificity, the quantum of damages, it will ask leave of the Court to amend this Complaint to insert said sums herein.

## SECOND CAUSE OF ACTION –
## VIOLATION OF SECTION 2 OF THE
## SHERMAN ACT, 15 U.S.C. § 2

(Against Monster)

65.    The allegations set forth above at paragraphs 1 through 64 inclusive of this Complaint are incorporated by reference as if fully set forth hereat.

66.    Beginning on or about 2007 and continuing to the present, defendant has engaged in a plan and scheme to achieve or maintain monopoly power in the energy drink market for both military resale and civilian retail in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

67.    The actual monopolization, or alternatively the attempt to monopolize, has consisted of a deliberate court of action, undertaken by defendant Monster with the specific intent of eliminating Plaintiff Hip Hop, and other energy drink competitors as factors in the energy drink military resale and civilian retail markets in the United States and in foreign commerce, as follows:

   a) Conspiring with brokers so that those brokers refuse to deal with Plaintiff Hip Hop, and other energy drink competitors, even though

the brokers have conducted business with Plaintiff preceding January 2013, when Plaintiff received the Mid-Valley termination letter;

68.   This course of conduct has resulted in Defendant Monster actually monopolizing the energy drink military resale and civilian retail markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2). Alternatively, if Defendant Monster's conduct has fallen short of actually monopolizing those markets, it presents a dangerous probability of success in monopolizing those markets characterized by high entry barriers in terms of extraordinary capital requirements, entrenched competitors and other factors.

## THIRD CAUSE OF ACTION –
## VIOLATION OF SECTION 3 OF THE
## CLAYTON ACT, 15 U.S.C. § 14

(Against Monster)

69.   The allegations set forth above at paragraphs 1 through 68 inclusive of this Complaint are incorporated by reference as if fully set forth hereat.

70.   Beginning in or about 2007, and continuing up to present, Defendant Monster has, by its exclusive dealing arrangements with brokers in the military resale and civilian retail markets, threatened to and unreasonably restrained competition and trade and commerce in the energy drink market in violation of Section 3 of the Clayton Act (15 U.S.C. § 14).

71.   Defendant Monster's exclusive dealing arrangements foreclosed a significant share of the market because Plaintiff cannot practicably sell energy drink products directly to consumers.

72.   Defendant Monster's exclusive dealing arrangements had a significant adverse effect on competition and has resulted in a significant amount of commerce

HIP HOP BEVERAGE CORP. V. MONSTER ENERGY COMPANY COMPLAINT

foreclosed in the relevant markets and tends to create or maintain a monopoly for Defendant Monster.

### FOURTH CAUSE OF ACTION –
### VIOLATION OF BUSINESS &
### PROFESSIONS CODE § 16720

(Against Monster)

73.    The allegations set forth above at paragraphs 1 through 72 inclusive of this Complaint are incorporated by reference as if fully set forth hereat.

74.    Count Four of this Complaint is based on the doctrine of supplemental jurisdiction as set forth in 28 U.S.C. § 1367 because the claim asserted is ancillary to the federal antitrust claims and arises from the same transactions and the same nucleus of operative facts as are set forth in Counts One – Three.

75.    Beginning in or about 2007, and continuing up to present, Defendant Monster has, by its exclusive dealing arrangements with brokers in the military resale and civilian retail markets, entered into an agreement for the purpose of restraining free trade in violation of Section 16720 of the Business & Professions Code.

### FIFTH CAUSE OF ACTION –
### VIOLATION OF BUSINESS &
### PROFESSIONS CODE § 17200

(Against Monster)

76.    The allegations set forth above at paragraphs 1 through 75 inclusive of this Complaint are incorporated by reference as if fully set forth hereat.

77.    Count Five of this Complaint is based on the doctrine of supplemental jurisdiction (28 U.S.C. § 1367) because the claim asserted herein is ancillary to the federal antitrust claims above and arises from the same transactions and from a common nucleus of operative facts as alleged in Counts One through Four.

78.    Section 17200 *et seq*. of the California Business & Professions Code is written in the disjunctive and broadly covers three varieties of unfair competition - acts that are unlawful, or unfair, or fraudulent. The statute's intent and purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.

79.    Plaintiff Hip Hop is a "person" within the meaning of California Business & Professions Code § 17201.

80.    As alleged herein, Defendant Monster's conduct constitutes "unfair" business practices. A practice may be deemed unfair even if not specifically proscribed by some other law. Conduct that significantly threatens or harms competition, or threatens an incipient violation of an antitrust law, may be deemed to be "unfair."

81.    As alleged herein, Defendant Monster's anticompetitive conduct is also "unlawful." Within the meaning of § 17200, virtually any violation of any civil of criminal federal, state of municipal, statutory, regulatory, court-made, or local law can serve as a predicate for an "unlawful" claim.

82.    By reason of, and as a direct and proximate result of Defendant Monster's unfair and unlawful practices and conduct, Plaintiff Hip Hop has suffered and will continue to suffer, financial injury to its business and property.

83.    Defendant Monster's unfair and unlawful conduct has caused harm to Plaintiff Hip Hop, competition and consumers.

84.    Pursuant to Section 17203, the entry of permanent and mandatory injunctive relief against Defendant Monster is necessary to enjoin Monster's ongoing wrongful business conduct. An injunction is needed to enable and restore competition in the market for dated goods.

## SIXTH CAUSE OF ACTION –

## INTENTIONAL INTERFERENCE

## WITH CONTRACTUAL RELATIONS

(Against Monster)

85.    The allegations set forth above at paragraphs 1 through 84 inclusive of this Complaint are incorporated by reference as if fully set forth hereat.

86.    On or about May 17, 2007, Plaintiff entered into a contract with Mid-Valley whereas Mid-Valley, among other things, agreed to provide Master Broker services on Plaintiff's behalf to the military resale market. Subsequent to the execution of the Mid-Valley contract with Plaintiff, Defendant Monster interfered with this contractual relationship by threatening Mid-Valley to terminate the contract with Plaintiff otherwise Mid-Valley would lose High Plains as its Sub-level Broker. Mid-Valley, with no feasible financial alternatives, succumbed to Monster's threat.

87.    By wrongfully and willfully interfering with Plaintiff's contractual relations with Mid-Valley, Defendant Monster caused Plaintiff damages, including lost sales, in a sum to be proved at trial.

88.    The aforementioned acts of Defendant Monster constitute "oppression" and "malice" within the scope of California Civil Code § 3294, and, therefore, Plaintiff is entitled to punitive damages in an amount to be determined by the trier of fact.

## SEVENTH CAUSE OF ACTION –

## INTENTIONAL INTERFERENCE WITH

## PROSPECTIVE ECONOMIC ADVANTAGE

(Against Monster)

89.    The allegations set forth above at paragraphs 1 through 88 inclusive of this Complaint are incorporated by reference as if fully set forth hereat.

19

90.    Beginning in or around 2007, and thereafter, Plaintiff had prospective economic relations with various customers of its products, including but not limited to DECA, Costco, and Walgreen.

91.    At all relevant times, Defendant Monster knew of Plaintiff's business and prospective economic relationships with DECA, Costco, and Walgreen, based upon its communications with at least High Plains and/or Mid-Valley, and also possibly the customers themselves.

92.    Plaintiff is informed and believes, and on that basis alleges, that between approximately beginning May 2007, Defendant Monster took steps to prevent Plaintiff from being allowed to participate in the U.S. military resale and civilian retail markets for energy drinks. The foregoing acts of Defendant Monster was done with the intent to harm Plaintiff financially and to induce Mid-Valley not to perform the obligations under its contract with Plaintiff, and to thereby interfere with and frustrate Plaintiff's ability to sell its products to DECA, Costco, and Walgreens, which would, in turn, interfere with and disrupt Plaintiff's prospective economic relations with those customers.

93.    As a proximate result of Defendant's conduct as alleged hereinabove, Plaintiff's prospective business relationships with DECA, Costco, and Walgreens was disrupted in that Plaintiff was prevented by Defendants from conducting its business within the U.S. military resale and civilian retail markets.

94.    As a proximate result of Defendant's conduct as alleged hereinabove, Plaintiff has suffered damages in an amount according to proof at the time of trial.

95.    The aforementioned acts of Defendant Monster constitute "oppression" and "malice" within the scope of California Civil Code § 3294, and, therefore, Plaintiff is entitled to punitive damages in an amount to be determined by the trier of fact.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for Judgment against Defendant, as follows:


ON THE FIRST, SECOND, THIRD, FOURTH, FIFTH, SIXTH, AND SEVENTH CAUSES OF ACTIONS:

1.  General damages, in an amount according to proof, in excess of the jurisdictional minimum of this Court; and,

2.  Special damages, in an amount according to proof, in excess of the jurisdictional minimum of this Court.

3.  Other proper relief; and,

4.  Costs of suit.


DATED: March 1, 2016            By: /s/Carlos A. De La Paz

                                Carlos A. De La Paz, Esq.,

                                Attorney for Plaintiff

                                HIP HOP BEVERAGE CORPORATION

21

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury.


DATED: March 1, 2016          By: <u>/s/Carlos A. De La Paz</u>

Carlos A. De La Paz, Esq.,

Attorney for Plaintiff

HIP HOP BEVERAGE CORPORATION