FILED
CLERK, U.S. DISTRICT COURT

Oct 26, 2016

CENTRAL DISTRICT OF CALIFORNIA
BY: _____PMC_____ DEPUTY

JS-6

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| HIP HOP BEVERAGE CORPORATION, a Nevada corporation,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>MONSTER ENERGY COMPANY, a Delaware corporation, and DOES 1 through 10,<br><br>                    Defendants. | CASE NO.  2:16-CV-1421-SVW-FFM<br><br>**ORDER GRANTING MOTION TO DISMISS [40]** |

## I.    BACKGROUND

The facts in the First Amended Complaint ("FAC") are largely the same as the original complaint. This Court adopts most of the facts from its first Order, making changes where necessary to reflect the FAC.

On March 3, 2016, plaintiff Hip Hop Beverage Corporation ("Hip Hop" or "Plaintiff") filed a complaint against Monster Energy Company ("Monster" or "Defendant"). Dkt. 1. On July 28, 2016, Hip Hop filed its FAC. Dkt. 35. Hip Hop brings seven claims: (1) violation of § 1 of the Sherman Act; (2) violation of § 2 of the Sherman Act; (3) violation of § 3 of the Clayton Act;

(4) violation of the Cartwright Act; (5) violation of California Business & Professions Code § 17200 (the "UCL"); (6) intentional interference with contractual relations; and (7) intentional interference with prospective economic advantage. *See* FAC.

On August 31, 2016, Defendant filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6). Dkt. 40. Defendant asserts that the complaint should be dismissed in its entirety. For the reasons stated below, the Court GRANTS Defendant's motion to dismiss.

## II.   LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A complaint that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id*. (internal quotation marks omitted). "Allegations in the complaint, together with reasonable inferences therefrom, are assumed to be true for purposes of the motion." *Odom v. Microsoft Corp.*, 486 F.3d 541, 545 (9th Cir. 2007).

## III.   FACTUAL ALLEGATIONS

### A. Parties

Plaintiff is a corporation engaged in the production, sale, and distribution of energy drinks marketed under "Pit Bill Energy Products." FAC ¶ 3. Defendant is also engaged in the

production, sale, and distribution of energy drinks. *Id*. ¶ 4. The companies are direct competitors in the energy drink product market. *Id*. ¶ 5.

### B.  Relevant Market

Plaintiff contends that the relevant product and geographical markets are broad. Plaintiff asserts that "[t]he relevant product[s] in this case are energy drinks." *Id*. ¶ 7. Plaintiff alleges that the relevant market ("Relevant Market") at issue in this case are the "worldwide exchanges and commissaries within the control of the Military Resale System." *Id*. ¶ 6. There are significant barriers to market entry because of intellectual property, several entrenched competitors (including Monster, Rock Star, and Red Bull), and capital requirements. *Id*. ¶ 58.

The U.S. Defense Commissary Agency  ("DECA") operates the "Military Resale System." *Id*. ¶ 9. The Military Resale System consists of over 3,000 exchanges, 247 commissaries, hundreds of convenience stores, package stores, troop stores, and "other facilities." *Id*. ¶ 6. The Military Resale System is for members of the U.S. military and is located on bases, large maritime ships, and other areas where U.S. soldiers, sailors, airmen, marines, and coastguardsmen are stationed. *Id*.

To be eligible to supply products to the Military Resale Market, manufacturers must comply with DECA's purchasing and stocking process in addition to meeting the requirements of U.S.C. Title 10 (Organization and General Military Powers). *Id*. ¶ 21. Before its products may be sold in the Military Resale Market, a manufacturer must meet with DECA and receive a product code for each product that DECA authorizes to be sold in a commissary. *Id*. ¶¶ 14–15. Different product codes confer varying levels of access to commissaries, including a range of options from mandatory worldwide stocking to optional regional stocking. *Id*. ¶¶ 15–16.

Because DECA's purchasing and stocking process is complex, manufacturers typically require the use of consultants or brokers. *Id*. ¶ 17. Plaintiff alleges, on information and belief,

3

that a manufacturer that has never conducted business with DECA must have the assistance of a broker for the initial presentation where DECA determines which product codes the products should be awarded.[1] *Id.* ¶¶ 14, 17, 21.

There are at least two types of brokers. *Id.* ¶ 23. Master level brokers ("Master Brokers") coordinate and present manufacturers' products to DECA for initial introduction into the Military Resale Market, manage product distribution, ensure that manufacturers are connected to and able to use DECA's electronic data interchange system, and ensure that each products' Universal Product Code ("UPC") is entered correctly into DECA's electronic system. *Id.* ¶ 25. Master Brokers are also responsible for coordinating product reviews for particular products to increase a product's code designation so that it is more widely available in the commissaries. *Id.* ¶ 26.

Master Brokers often utilize commissary level brokers ("Sub Brokers") to conduct store-to-store sales and monitor product inventory in commissaries. *Id.* ¶ 27. Sub Brokers are responsible for in-store merchandising of manufacturers' products at physical store locations. *Id.* ¶ 28. This involves walking through the stores to monitor product inventory levels and ensure the quality of displays. *Id.* ¶¶ 28–29.

### C.  Monster's Market Manipulation

In 2007, Plaintiff, in compliance with DECA's requirements, hired Mid Valley Products ("Mid Valley") as a Master Broker. *Id.* ¶¶ 31–32. As a part of the contract, Mid Valley agreed to provide Plaintiff with a Sub Broker at each commissary. *Id.* ¶ 32. At the time, Mid Valley already had an existing contract with High Plains Marketing Services, Inc. ("High Plains") to act

---

[1] Plaintiff alleges, on information and belief, that Monster was aware that Plaintiff and other competitors, would not be allowed to sell products through the military resale system without a Master Broker or Sub Broker. FAC ¶ 52.

4

as a Sub Broker for Mid Valley's manufacturing customers.[2] *Id.* ¶ 33. Accordingly, High Plains served as Hip Hop's Sub Broker.

On January 4, 2013, Plaintiff received a letter from Mid Valley's President, Michael Stewart ("Stewart"), indicating the firm was terminating the contract between Plaintiff and Mid Valley "due to conflicts at the broker level with regards to competing energy drink companies." *Id.* ¶ 35. Subsequently, in 2014, Hip Hop filed suit against Mid Valley in *Hip Hop Beverage Corp. v. Eurpac Serv. Inc.*, No. 14-CV-02049-JFW-AJW. *Id.* ¶ 36. During discovery for that case, Stewart testified that Mid Valley had terminated its contract with Plaintiff because Monster instructed High Plains to inform Mid Valley that High Plains would terminate its contract with Mid Valley if it did not cancel its contract with Plaintiff. *Id.* ¶¶ 37–38. Mid Valley complied with the request because terminating its contract with Plaintiff was a more economically feasible option than losing its contract with High Plains. *Id.* ¶ 37. According to an email from Stewart uncovered in the discovery, Hip Hop "finally hit Monster's radar" because Hip Hop had become "really aggressive lately." *Id.* ¶ 39.

After Mid Valley terminated the Master Broker contract, Plaintiff retained Reese Group ("Reese") as a Master Broker. *Id.* ¶ 43. But shortly after the contract was signed, Reese terminated its Master Broker contract with Plaintiff with no explanation. *Id.* Plaintiff alleges that this was once again due to Monster's influence with High Plains. *Id.* ¶¶ 44–45. In an August 12, 2013 email from Stewart to High Plains President, Don Goetz ("Goetz"), Stewart states, "[t]his may be a continuation of the problem – doesn't [High Plains] represent Reese Sales?" *Id.* ¶ 45. Goetz replied, "Michael, we talked to Reese and they resigned [Hip Hop]." *Id.* Plaintiff takes the exchange to show that Monster exerted its influence over High Plains to pressure Reese to terminate its Master Broker contract with Hip Hop. *Id.* ¶¶ 44–45.

---

[2] At around the same time, High Plains was also serving as a Sub Broker for Monster. FAC ¶ 34.

5

In the fall of 2013, Plaintiff retained WEBCO General Partnership ("WEBCO") to provide Master Broker and Sub Broker services for its products. *Id*. ¶ 46. But again, in November 2014, WEBCO ceased honoring its obligations with Plaintiff. *Id*. Even though Plaintiff has attempted to get WEBCO to explain why it refuses to do business with Plaintiff, WEBCO has not yet responded to Plaintiff's request. *Id*. Plaintiff alleges that their contract with Mid Valley was disrupted by Monster's undue influence and economic duress. *Id*. ¶ 53.

### D.  Market Effect

Plaintiff alleges that "Monster controls the Relevant Market by controlling the only available brokers necessary to reach the consumers." *Id*. ¶ 54.[3] Thus, "Plaintiff and other competitors of Monster, are unable to deliver their products to customers within the Relevant Market." *Id*. Plaintiff further alleges that Monster enters into exclusive dealing agreements with the limited number of brokers which prevents them from dealing with Monster's competitors, and has the effect of preventing competitors from entering the market. *Id*. ¶ 51.

In 2014, Mid Valley signed a contract with Monster to provide it with Master Broker services. *Id*. ¶ 55. On information and belief, Plaintiff asserts that Monster plans to control the Military Resale Market by controlling brokers. *Id*.

The anti-competitive effect of Monster's exclusive dealing agreements with brokers is that Plaintiff was excluded from selling energy drink products to customers between 2007 and 2015. *Id*. ¶ 56. Further, because Plaintiff has been unable to contract with a broker, it is forced to sell its products without a broker and was unable to sell its products to DECA for several months

---

[3] Plaintiff also alleges that Monster harms competitors by exerting influence over Master Brokers and Sub Brokers "to neglect the servicing of competitor's products. FAC ¶ 51. While in contract with Mid Valley, Plaintiff experienced several problems with the firm's services including "shoddy product displays, incorrect entry of Plaintiff's product UPC information in DECA's electronic accounting system, and overall neglect regarding product placement and presentation with DECA for product code advancement." *Id*. ¶ 40. Some commissaries did not receive orders from Hip Hop because of incorrect UPC information, but the brokers did not correct these problems due to their agreement with Monster. *Id*. ¶ 41.

due to the disruption of its business. *Id.* ¶ 57. Accordingly, Monster has caused Plaintiff to lose profits. *Id.* Plaintiff maintains that Monster's acts: (1) suppress or diminish competition; (2) reduce consumer choice; and (3) reduce distributor and shipper choice. *Id.* ¶ 60. Additionally, consumers must pay higher prices for energy drinks "established by" Monster. *Id.* ¶ 64.

## IV.   ANALYSIS

### A.  Injury to Competition

This Court finds that Plaintiff has not sufficiently cured the defects from their original complaint. This Court provided Plaintiff with numerous cases that this Court relied on, yet Plaintiff's FAC does not meet the standard put forth in these cases.

In *Perry v. Radio* a doctor alleged that other doctors in the relevant market conspired to get his credentials revoked by soliciting cooperation among others in the industry to boycott his practice. 504 F. Supp. 2d 1043, 1045 (E.D. Wash. 2007), *aff'd*, 343 F. App'x 240 (9th Cir. 2009). As cited in the first Order, the *Perry* Court held that "[i]n absence of a showing that the market as a whole has been affected, the fact one competitor must practice elsewhere is not an antitrust injury." *Id.* at 1047 (internal citations omitted). To further elaborate, the *Perry* Court found that:

> Plaintiffs' Complaint [is] concerned with the impact on Dr. Perry of the alleged agreement, combination or conspiracy by the Defendants, rather than with injury to competition in general. At most, the Complaint makes conclusory allegations of injury to competition. This is insufficient. Furthermore, it is unreasonable to infer from the allegation of injury to Dr. Perry that there was also injury to competition. No facts are pled showing a cognizable antitrust injury (i.e., a *rise in the price* of OB/GYN services above a competitive level; *decrease in the supply* of OB/GYNs in the relevant market, or a *decrease in the quality* of OB/GYN service provided).

*Id.* (emphasis added). Similarly here, Plaintiff makes conclusory allegations of injury to competition, but does not plead specific facts of a cognizable antitrust injury as expressed in *Perry*. Plaintiff does not allege the price of products in the market, only stating conclusory that "consumers are forced to pay higher prices for energy drinks."[4] FAC ¶ 64. Plaintiff does not

---

[4] This allegation was in the original complaint as well, compl. ¶ 63, which the Court found insufficient.

plead the supply or quality of products in the market, let alone a decrease in them. Despite this Court's reliance on *Perry*, Plaintiff did not plead facts sufficient to cure the defects elucidated by the *Perry* Court. Therefore, this Court finds that Plaintiff *cannot* plead such facts, and further amendment would be futile.

In the first Order, this Court also relied on the case *Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019 (9th Cir. 2013). in *Gorlick*, the Plaintiff alleged a vertical agreement between Allied Exhaust Systems and Car Sound Exhaust System in which Car Sound offered preferential terms of trade to Allied, but not Plaintiff. *Gorlick Distribution Centers, LLC*, 723 F.3d at 1021. The District Court granted summary judgment in finding that there was no evidence Car Sound "made this decision at Allied's behest." *Id.* at 1024 (internal quotation marks omitted). The Ninth Circuit affirmed, but rejected this reasoning. *See id.* It stated that "even assuming that Allied and Car Sound had an agreement, the Sherman Act claim fails because [Plaintiff] produced no evidence that the vertical restraint actually injured competition." *Id.* Though this case is at the Motion to Dismiss stage, not Summary Judgment, Plaintiff's failure to properly *allege* an injury to competition is just as fatal here.

**B. Market Power**

In the first Order, this Court found that "Plaintiff's market power allegations are largely conclusory and do not provide requisite detail of market injury or market structure." Order at 6. Plaintiff fails to cure this defect because Plaintiff fails to add *any* additional allegations of market power. Plaintiff argues "the FAC alleges that Monster has a significant market share and there are high barriers to entry. Accordingly, the Motion [to dismiss] should be denied." Pl. Opp. At 10. Such allegations were in the original complaint. *See* compl. ¶¶54, 71. Thus, for the same reason, this Court dismisses them.

Specifically, this Court continues to rely on *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963 (9th Cir. 2008). Plaintiff in that case alleged a "tying product" antitrust violation between gasoline franchises of Defendant and credit-card processing services. *Id.* at 972. The Ninth Circuit affirmed dismissal in part because,

> Rick-Mik's complaint does not allege that Equilon has market power in the relevant market. . . . Indeed, other than stating that '[Equilon] rank[s] number one in the industry in branded gasoline stations,' there are no specific allegations at all

8

> as to the franchise market. The complaint alleges nothing about, for example, what percentage of gasoline franchises are Equilon's (Shell/Texaco) as compared to other franchises like Chevron, Mobil, Marathon Oil, or Union 76. . . . There are no factual allegations regarding the relative difficulty of a franchisee to switch franchise brands.[5]

*Id.* at 972. Similarly here, Plaintiff states that Defendant has substantial power in the market (though not even that it is "number one"). The complaint does allege that Plaintiff controls "the only available brokers necessary to reach the consumers." FAC ¶ 54. This seems to suggest 100% control. Plaintiffs also allege, however, that Defendant controls "a major percent of such market." FAC ¶ 4. This suggests less than 100% and is couched in conclusory language no better than the language found insufficient in *Rick-Mik Enterprises* that Defendants were "number one in the industry." Somewhat contradictory, Plaintiff further alleges the existence of other "entrenched competitor[s]" with Monster, such as Rockstar and Red Bull, without explaining the comparative power in the market place between the three. *See* FAC ¶ 58. Amidst all this inconsistency, Plaintiff never adequately alleges the extent of Monster's power over the brokers. The most glaring defect is the fact that Rockstar and Red Bull must have brokers themselves and as such Monster cannot control "the *only* available brokers" (emphasis added).[6] Further, Plaintiff fails to identify the "relative difficulty" of switching brokers. *See Rick-Mik* at 972. Plaintiff does not plead these facts despite knowing that this Court relied on *Rick-Mik* in its first Order. Thus, this Court finds Plaintiff cannot plead these facts and further amendment would be futile.

This Court agrees with Defendants that, at most, Plaintiff sufficiently pleads an agreement between Monster and High Plains. Plaintiff does not allege if they had alternative choices for sub-brokers that High Plains does not control, or otherwise allege High Plains dominance in the Master Broker market. Thus, there are no facts sufficient to allege that the existence of this one agreement with one Master Broker has any effect on competition, other than injuring Plaintiff, or that it establishes Monster's substantial power in the market.

---

[5] The Plaintiff in *Rick-Mik* also alleged barriers to entry. 532 F. 3d at 972.
[6] In fact, Plaintiff does not allege the relative power between these actors in the marketplace. It could be that Monster has a relatively minor share of the market compared to Red Bull and Rockstar, contrary to Plaintiff's conclusory allegation that their share is "significant."

**C.  Interference Claims**

As in the last order, "Plaintiff's interference claims also fail because there must be a predicate unlawful act to support an interference claim based on an at-will agreement." Order at 6–7. (citing *Reeves v. Hanlon*, 95 P.3d 513, 520 (Cal. 2004) ("[A] plaintiff seeking to recover for interference with prospective economic advantage must also plead and prove that the defendant engaged in an independently wrongful act in disrupting the relationship.")). Without the alleged antitrust violations, there is no "predicate unlawful act" Monster allegedly committed.

Though *Reeves* analyzed an at-will employment contract, subsequent courts have applied *Reeves* to the issues presented here. Plaintiff claims an interference with contractual relations and an interference with prospective economic advantage. *See* dt. 35. The Court in *Gartner, Inc, v. Parikh* applied *Reeves* to an interference with contractual relations claim that involved at-will contracts. No. CV 07-2039-PSG, 2008 WL 4601025, at *6 (C.D. Cal. Oct. 14, 2008).[7] The Court in *Integrated Healthcare Holdings, Inc. v. Fitzgibbons* applied *Reeves* to a claim for interference with prospective economic advantage. 44 Cal. Rptr. 3d 517, 531 (Cal. Ct. App. 2006). This Court relied on both these cases in its first Order. Order at n. 7. Thus, Plaintiff was on notice of the law this Court would apply and yet have not alleged any predicate unlawful act by Monster apart from their antitrust allegations. This Court concludes that Plaintiff *cannot* allege any other predicate unlawful act, and thus further amendment would be futile.

**V.    CONCLUSION**

The Court finds Plaintiffs allegations implausible, *see Ashcroft*, 556 U.S. at 678, in light of unexplained inconsistencies. Plaintiff pleads that Monster has "significant" control of the market, but does not plead any specific facts of its control. Plaintiff admits other "entrenched competitors" in the market without accounting for how these competitors affect Monster's power in the market or acknowledging that such competitors make it implausible for Monster to control "the only available brokers necessary to reach the consumers." *See* FAC ¶ 54.

---

[7] Plaintiffs do not dispute that their contract with Mid Valley was at-will.

Plaintiff has had a second chance to state an antitrust claim and related interference claims. The Court gave Plaintiff notice of what cases it relied on, yet still Plaintiff could not in good faith plead additional facts sufficient to cure the defects of the original complaint. Therefore, this Court finds any future amendments would be futile and dismisses the case WITH PREJUDICE.

IT IS SO ORDERED

Date:     October 26, 2016


_____
HON. STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

11